# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ROANOKE DIVISION

| | |
|---|---|
| **TERRANCE ROBERT HENDERSON,** ) | |
| Plaintiff, ) | Civil Action No. 7:19cv00258 |
| ) | |
| ) | **REPORT AND** |
| v. ) | **RECOMMENDATION** |
| ) | |
| **N. PRESLEY, et al.,** ) | By: Pamela Meade Sargent |
| Defendants. ) | United States Magistrate Judge |

The pro se plaintiff, Terrance Robert Henderson, ("Henderson"), a Virginia Department of Corrections, ("VDOC"), inmate, sued various VDOC employees in this civil rights action pursuant to 42 U.S.C. § 1983. Henderson claims that the defendants violated his rights under the First, Eighth and Fourteenth Amendments and Virginia law by using excessive force, imposing inhumane conditions of confinement, retaliating against him and committing the torts of assault and battery. The matter is before the court on the Defendants' Motion For Summary Judgment, (Docket Item No. 41) ("Motion"). The Motion is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). The undersigned now submits the following report and recommended disposition.

## I.   Facts

In his verified Complaint, Henderson stated that he was incarcerated in the D-2 Housing Unit at Wallens Ridge State Prison, ("Wallens Ridge"), on December 27, 2018, when defendants Presley, Clark and M. Sluss came to his cell door and told him to pack his property to move. A few minutes later, Clark and Sluss returned to Henderson's cell door and placed Henderson in handcuffs and leg shackles to

remove him from his cell. When Henderson asked where and why he was being moved, Sluss responded that he was "going to a special place for people who like to complain." Henderson said that Clark and Sluss escorted him to the cell 101 in the D-1 Housing Unit.

Henderson said that, as he approached cell 101, Clark and Sluss told him that the cell was "pretty nasty because the last guy wasn't too clean." Henderson said that cell 101 was extremely filthy with its floors, toilet and walls soiled with trash, urine, blood and feces. He said that the cell contained milk bags with spoiled milk leaking from and them, and it smelled of urine and feces. Henderson said that he asked Clark and Sluss to have the cell cleaned before placing him in it. Clark and Sluss denied his request and told him he "should learn to stop bitching and complaining" and maybe then he "wouldn't have these problems." He said that Clark and Sluss then threw his property bag inside the cell in a pile of trash and ordered him to kneel down in the cell to be removed from restraints.

Henderson said that he, again, requested that the cell be cleaned, and he refused to enter the cell until it was cleaned. According to Henderson, Clark and Sluss called several other correctional officers, including defendants E. Orr, Officer Ramey, T.N. Bailey, N. Presley and another officer. Henderson said that Clark and Sluss and possibly other defendants stepped on his leg shackles and slammed him to the floor, causing him to hit his face, shoulder and mid-section on the floor extremely hard. As he laid on the floor screaming, Henderson claims the officers began bending his arms and hands, threatening to break them if he did not be quiet. Henderson said that defendant Ramey and others lifted him from the floor by his throat. He said he was ordered to stand up, but he replied that he could not stand because his ankle was hurting. Henderson said the defendants then slammed him down again outside of the cell. Defendant Captain T. W. Hall, Jr., arrived and ordered the officers to "get the

restraints." Henderson said the officers then lifted him from the floor, dragged him into cell 101 and threw him onto the steel bed frame. Hall then ordered the officers to "strip him." Ramey then began ripping Henderson's clothes off, stripping him down to his boxer shorts, while defendants Bailey, Presley and Ramey made comments like "we should gang rape his black ass" and that he was going to learn to "stop writing shit up." After his clothing was removed, Henderson said he was placed in four-point ambulatory restraints, which were tightened to the point that he sustained cuts to his ankles and wrists, as well as swelling.

Henderson said that he was left in the unclean cell with no clothing other than his undershorts, no heat, no mattress or bedding, no soap, no toilet paper and without water, including water to flush the toilet, for 24 hours. He said that he was forced to eat his meals with unwashed hands. Henderson said that he did not receive a bathroom break or any medical treatment during the 24 hours he was in restraints.

In his verified response to the Motion, Henderson said that defendants Ramey, Presley, Hall "and others" came to his cell on December 27, 2018, and told him that they would teach him "a lesson about complaining," referencing the fact that he had filed a lawsuit against prison correctional staff a week earlier. Henderson also said that he previously had filed several complaints and grievances against defendants Presley, Hall, Bailey and others. He said that he was restrained while the defendants searched his cell and scattered his personal property. He said that Presley stated to him "I may find a knife in here somewhere." Approximately 20 minutes later, Clark and Sluss told him to pack his property because he was "going somewhere special."

Henderson said that, when he arrived at cell D-101, he refused to enter the cell until it was cleaned. He said that Clark "and/or" Sluss became angry and hostile and stated "we ain't having nothing cleaned, so kneel the fuck down or you're going to

-3-

get put down." Henderson said that defendants Bailey, Presley and Ramey were called to the cell, and Bailey ordered the other defendants to "put his ass down." He said that Clark and Sluss stepped on his leg shackles and drove him to the floor. Henderson said that Hall arrived at the cell and ordered defendants Ramey, Orr, Presley and Craft to pick him up off the floor. He said that Ramey and/or Orr grabbed him by the throat and lifted him. He said he was ordered to stand up, but he could not because of the pain in his ankles.

Henderson said that Hall then ordered that he be placed in ambulatory restraints. He said that his clothing was removed except for his boxer shorts, and he was placed in restraints by Bailey, Ramey, Presley, Orr and Craft. Henderson said that Intelligence Officer D. Harris was called to take photographs of his alleged injuries, but that Harris took photographs of only those parts of his body that were not injured.

In support of the Motion, the defendants have provided a number of affidavits. In his Affidavit, (Docket Item No. 42-1), Presley stated that he and Ramey were inspecting Henderson's cell in the D-2 Housing Unit when they discovered that he had tampered with a shelf in the cell by scoring a pattern into the edge of the shelf. He said that he wrote Henderson an institutional disciplinary charge for Intentionally Destroying, Altering, Damaging or Defacing State or Any Persons [sic] Property. As a result of the charge, Presley said, Henderson was ordered to be moved to camera cell D-101 for observation. Clark and Sluss arrived to escort Henderson and his property to cell D-101, and Presley, Ramey and Bailey followed them to the D-1 Housing Unit.

Presley said that, when they arrived at cell D-101, Henderson refused repeated orders to kneel so that his leg shackles could be removed. He said that Henderson

threatened to head butt Clark. When Clark and Sluss attempted to make Henderson kneel, he fell forward onto his property bag, dragging Clark down with him. Presley said that he, Sluss and Ramey then moved quickly into the cell to secure Henderson on the ground. He said they then attempted to get Henderson to his feet, although he refused to stand on his own. After they moved Henderson out of the cell, Henderson again collapsed to the ground.

Presley said that Craft and Orr arrived to relieve Clark and Sluss. Craft, Orr, Ramey and Presley then carried Henderson by his arms to a pod table to wait for his property to be removed from this cell and for ambulatory restraints to be approved. Once this occurred, Ramey and Presley carried Henderson back into the camera cell. Presley said that he assisted Ramey, Craft, Orr and Bailey in removing Henderson's clothing and applying ambulatory restraints. Presley said that he left the cell after restraints had been applied, and Henderson was examined by medical staff and the institutional investigator. Presley said that appropriate force was used at all times, and restraints were applied in accordance with policy and were not overly tight. Presley said that he did not make any threatening, abusive or retaliatory comments to Henderson; nor did he hear any other officer do so.

In his Affidavit, (Docket Item No. 42-2), Clark stated that he received an order to escort Henderson to camera cell D-101 on December 27, 2018, after he was found to have tampered with furniture in his cell. Clark said that he and Sluss escorted Henderson to D-101 and were joined by Ramey, Presley and Bailey. When they arrived at cell D-101, Clark said, Henderson refused orders to kneel to allow his leg restraints to be removed. Clark said that Henderson told him "fuck you I ain't taking no knee." He said that Henderson turned his head toward Clark and said "keep telling me to take a knee and I'll head-butt your cracker ass." Clark said that he then attempted to place Henderson on his knees when Henderson fell forward and pulled

him down on top of him. Clark said that Sluss and Ramey quickly moved to control Henderson on the floor. Presley also entered the cell to assist.

Clark said that he, Sluss, Ramey and Presley attempted to lift Henderson up by his arms to get him back to his feet to move him out of the cell. He said that Henderson refused to support his own weight, and he collapsed back to the floor as soon as he was removed from the cell. Clark said that he and Sluss were then relieved by Craft and Orr, although he stayed in the area to operate the handheld camera while Henderson was placed in ambulatory restraints. Clark said that appropriate force was used at all times and ambulatory restraints were applied in accordance with policy and were not overly tight. He said that he did not make any threatening, abusive or retaliatory comments to Henderson; nor did he hear any other officer do so.

In his Affidavit, (Docket Item No. 42-3), Hall stated that he was working as a correctional lieutenant in the D-Building at Wallens Ridge on December 27, 2018, when he was notified that an inspection of Henderson's cell revealed that he had "sharpened the edge of a metal shelf." Hall said the correctional major ordered that Henderson be moved to a camera cell in the D-1 Housing Unit so that he could be observed and monitored. Bailey advised him that staff had been required to use physical force to maintain control of Henderson. Hall said that he then went to the D-1 Housing Unit and began recording what was occurring with a handheld video camera. He said that he relieved Clark and Sluss from their duties because they had been involved in the incident with Henderson. Hall said he gave Clark the video camera so he could continue to record the events.

Hall said that, based on Henderson's actions and threats toward staff, he recommended that Henderson be placed in ambulatory restraints. He said that he

then left the building and completed an In-Cell Restraints authorization form, which was approved by Administrative Duty Officer Captain J. Brown. Hall said that he then returned to the D-1 Housing Unit and supervised the placement of Henderson in ambulatory restraints. Hall said that Henderson was placed in restraints in accordance with policy and without incident. He said that medical staff and the institutional investigator were given an opportunity to examine Henderson, and no injuries were observed. Hall said that he did not observe any misuse of physical force, and he did not hear any officers make any threatening, abusive or retaliatory comments towards Henderson.

In his Affidavit, (Docket Item No. 42-4), D. Harris stated that he is the Intel Officer at Wallens Ridge. Attached to Harris's Affidavit were copies of the video recordings taken by the D-101 in-cell camera, the D-1 Pod cameras and the handheld camera of the incident in question on December 27, 2018. Harris also said that he took photographs of Henderson after he was placed in ambulatory restraints. Copies of these photographs were attached to Harris's Affidavit.

In his Affidavit, (Docket Item No. 42-5), Wallens Ridge Assistant Warden D. Anderson said that he was working as the Major at WRSP on December 27, 2018. Anderson said that Henderson, while housed in the D-2 Housing Unit, was charged with a violation of the disciplinary offense code for Intentionally Destroying, Altering, Damaging or Defacing State or Any Persons [sic] Property on December 27, 2018. He said that, as a result of this charge, he ordered that Henderson be moved to a camera cell in the D-1 Housing Unit. Anderson said that a decision was made to secure Henderson in ambulatory restraints, after Henderson "became combative during the escort.

Anderson said that ambulatory restraints are used to ensure the safety of the offender and/or the security of the institution. They consist of handcuffs, leg irons, a black box and either a waist chain or a chain connecting the black box on the handcuffs to the leg irons. He said that correctional officers are trained in the proper application and removal of restraints. He said that, once it was determined that Henderson no longer posed a threat to security, he was released from ambulatory restraints at 9 a.m. on December 28, 2018. Anderson said that Henderson was never placed in four-point restraints during this period.

During his placement in ambulatory restraints, Anderson said, staff observed Henderson at 15-minute intervals. He said that Henderson was provided meals and could have requested medical treatment at any time. Anderson said that, to the best of his knowledge, Henderson had running water in his cell on December 27, 2018, and Henderson was free to use the toilet if he chose to do so. If security or safety concerns arise, Anderson said, water to an offender's cell could be turned off for no longer than 72 hours. Anderson said that the shift commander was required do approve the water being shut off in a cell, and correctional officers did not have the authority to turn off the water to a cell except in an emergency situation where the cell is being flooded. If dry-cell procedures are approved, offenders are allowed to wash their hands and flush their toilets a minimum of seven times during each 24-hour period, including one-half hour prior to each mealtime. He said that, if the water is turned off to an offender's cell, the offender receives two pouches of drinking water with each meal.

Anderson said that medical personnel are advised when a decision is made to apply restraints within a cell, and a nurse or other qualified medical person examines the offender as soon as possible after the restraints have been applied to ensure that the restraints have been applied appropriately. Medical personnel also advise if an

-8-

offender has a condition that alters the general application of restraints. Anderson said that Henderson was checked by medical staff following his placement in ambulatory restraints on December 27, 2018, and no injuries were noted. Anderson said that, had Henderson voiced medical complaints during his time in ambulatory restraints, a member of the medical staff would have visited him and addressed the complaint. Anderson said that prison records show that Henderson was examined by medical staff once during his confinement in ambulatory restraints, and no injuries were observed. He said that Henderson also was assessed by medical staff upon his release from ambulatory restraints on December 28, 2018.

Anderson said that temperatures in the Wallens Ridge housing units are routinely monitored and logged and always are maintained at an appropriate level. He said that he had no reason to believe that Henderson's cell temperature was cooler than any other cell in that housing unit. Anderson also said that cells are routinely cleaned and inspected between assignments. He said that he had no reason to believe that Henderson ever was placed in a dirty cell at Wallens Ridge.

In her Affidavit, (Docket Item No. 42-6), Wallens Ridge Nursing Supervisor C. Collins stated that she had reviewed Henderson's prison medical records. She said that these records indicated that Henderson's ambulatory restraints were checked by a members of the prison's nursing staff at 10:10 a.m. on December 27, 2018. She said that the examining nurse was able to place two fingers under each restraint, confirming that they were not secured too tightly. She said that Henderson voiced no complaint, and no injuries were noted. A nurse returned to examine Henderson at 11:40 a.m. due to a complaint of swollen wrists. No visible swelling, bruising or discoloration was noted. Henderson had good pulses and capillary refill, and he was advised not to pull his wrists against the restraints. Henderson was assessed by medical staff upon his release from ambulatory restraints at

approximately 9 a.m. on December 28, 2018. At that time, no visual signs of injury were noted, and Henderson voiced no complaints. Henderson's medical records also indicate that a Qualified Mental Health Professional saw Henderson at his cell door on December 27, 2018, and "he appeared stable with no symptoms of distress."

The video evidence provided by the defendants neither confirms nor denies many of the assertions of the parties and witnesses. The video recording from inside cell D-101, (Enclosure A-1 to Docket Item No. 42-4), does show that no one threw Henderson's property bags into cell D-101, but rather an officer set the two bags down in the floor of the cell. (09:49:07.) The cell does not appear to be filthy, but there are a few items on the cell floor. The walls of the cell have paint peeling from them, but they do not appear to be soiled.

The video does show that one of the officers pushed Henderson forward into the cell and Henderson went down on top of his property bags. (09:52:09.)[1] Harris, in his Affidavit, identified this officer as Clark. The officer went down with Henderson, and three other officers followed them into the cell and held Henderson down for, at most, 16 seconds before lifting Henderson to his knees. (09:52:26.) Harris identified these officers as Sluss, Ramey and Presley. Approximately 30 seconds later, the officers attempted to lift Henderson up, (09:52:55), but you cannot see whether any of the officers had ahold of his throat or neck. The officers then move Henderson out of the cell, where he appears to fall to the floor again. (09:53:10.) A few moments later, the officers lift Henderson up again and eventually move him from the cell door area and the view of the in-cell camera.

---

[1] The times cited are from the time stamp recorded from the cell camera.

The view from one of the pod cameras shows little other than officers gathered with an offender at a cell entrance. (Enclosure A-2 to Docket Item No. 42-4.) At one point, this video does show the officers placing the offender on the floor outside of the cell. The view from the camera located at the other end of the pod, (Enclosure A-3 to Docket Item No. 42-4), shows nothing of the incident, other than the officers carrying Henderson to a table and seating him there. This camera's view of the D-101 cell area is obstructed by stairs.

One of the video recordings from the handheld camera begins with Henderson lying on this stomach on the floor. (Enclosure A-4 to Docket Item No. 42-4.) An officer orders other officers to "get him up out of the floor." (00:12.) Officers then attempt to stand Henderson up, and an officer gives him orders to "stand up." (00:18.) Henderson refuses to put his feet down underneath him while the officers hold him up. An officer is heard instructing someone to go get ambulatory restraints. (00:38.) Henderson then is moved and seated at a table. (01:01.) The camera's view of Henderson is obstructed by an officer for most of the time that he is seated at the table.

Another of the video recordings from the handheld camera begins with Henderson lying on this stomach on the bed in the cell. (Enclosure A-5 to Docket Item No. 42-4.) The video shows five officers removing Henderson's restraints and clothing before it ends. Another video begins with Henderson lying on his back on the bed in the cell and shows officers placing him in ambulatory restraints. (Enclosure A-6 to Docket Item No. 42-4.) This video does show that the leg irons of the ambulatory restraints fit loosely against Henderson's ankles. After placing Henderson in ambulatory restraints, the officers restrain him on the bed until a nurse comes and checks his restraints. Henderson remains restrained by the officers on the bed.

Another of the video recordings from the handheld camera begins with an officer reciting that the battery had died in the camera and had been replaced. (Enclosure A-7 to Docket Item No. 42-4.)  The officer states that they are waiting on the investigator to arrive and take photographs.  A person arrives with a camera and takes photographs of Henderson. You can hear the person ask Henderson, "Do you hurt anywhere?" You cannot hear Henderson's response. After the photographs are taken, the officers leave the cell and secure the cell door.

These videos also show little, if anything, on the visible sections of the cell floor.

## II.    Analysis

Henderson claims that defendants Clark, Sluss, Orr, Ramey, Bailey, Presley and Hall[2] violated his rights under the First, Eighth and Fourteenth Amendments and Virginia law by using excessive force, imposing inhumane conditions of confinement, retaliating against him and committing the torts of assault and battery. The Motion argues that there is no genuine dispute of material fact, and the defendants are entitled to summary judgment on Henderson's claims as a matter of law. In particular, the defendants argue that the facts, viewed in the light most favorable to Henderson, do not rise to the level of unconstitutional conditions of confinement. They also argue that Henderson's excessive force and assault and battery claims fail because the force used was trivial or de minimis and was justified under the circumstances. Defendants argue that Henderson's retaliation claim fails

---

[2] The court previously dismissed Henderson's claims against defendants Karen A. Stapleton and the VDOC.

because he has not produced evidence that the defendants were aware he had filed grievances or a lawsuit previously. Defendants further argue that they are entitled to qualified immunity.

With regard to a motion for summary judgment, the standard for review is well-settled. The court should grant summary judgment only when the pleadings, responses to discovery and the record reveal that "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a); *see, e.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986). A genuine issue of fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In considering a motion for summary judgment, the court must view the facts and the reasonable inferences to be drawn from the facts in the light most favorable to the party opposing the motion. *See Anderson*, 477 U.S. at 255; *Matsushita*, 475 U.S. at 587. In order to be successful on a motion for summary judgment, a moving party "must show that there is an absence of evidence to support the non-moving party's case" or that "the evidence is so one-sided that one party must prevail as a matter of law." *Lexington-South Elkhorn Water Dist. v. City of Wilmore*, *Ky.,* 93 F.3d 230, 233 (6th Cir. 1996). When a motion for summary judgment is made and is properly supported by affidavits, depositions or answers to interrogatories, the nonmoving party may not rest on the mere allegations or denials of the pleadings. *See Oliver v. Va. Dep't of Corrs.*, 2010 WL 1417833, at *2 (W.D. Va. Apr. 6, 2010) (citing FED. R. CIV. P. 56(e)). Instead, the nonmoving party must respond by affidavits or otherwise and present specific facts from which a jury could reasonably find for either side. *See Anderson*, 477 U.S. at 256-57.

Based on the evidence before the court, I find that there are genuine disputes of material facts that prevent the entry of summary judgment in the defendants' favor on all of Henderson's claims other than the conditions of confinement claim. On the conditions of confinement claim, I find that there is no genuine dispute of material fact, and the defendants are entitled to entry of summary judgment as a matter of law.

Henderson's conditions of confinement claim fails because the evidence before the court, when viewed in Henderson's favor, does not support a finding of unconstitutional conditions of confinement. Henderson claims that he was placed on strip cell status in ambulatory restraints in a cold, dirty cell without water for 24 hours. While the Eighth Amendment protects prisoners from cruel and unusual living conditions, "restrictive and even harsh" conditions that do not inflict harm "are part of the penalty that criminal offenders pay for their offenses against society." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). A claim of unconstitutional conditions requires a two-part showing: that the prison official acted with deliberate indifference (subjective component) to a substantial risk of harm (objective component). *See Muhammad v. Barksdale*, 2016 WL 627359, at *4 (W.D. Va. Feb. 16, 2016) (citing *Hudson v. McMillian*, 503 U.S. 1, 5 (1992)). To satisfy the objective component, a prisoner normally must provide evidence of a serious or significant physical or emotional injury resulting from the challenged conditions. *See Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995).

Viewing the evidence in favor of Henderson, he was placed on strip cell status in ambulatory restraints in a cold, dirty cell without water for 24 hours. He has not produced any evidence that he suffered any physical or emotional injury as a result of these conditions. Therefore, I find that there is no genuine dispute of material fact,

and I will recommend that the court enter summary judgment in the defendants' favor on this claim.

I find that genuine disputes of material facts exist that preclude the entry of summary judgment on Henderson's excessive force, retaliation and state law assault and battery claims. With regard to Henderson's excessive force and assault and battery claims, the defendants argue that a de minimis use of legally justified force will not support such claims. Nonetheless, there is a dispute as to whether the force used here was de minimis or justified. Henderson claims that he was slammed to the floor not once, but twice during this incident for no reason other than he requested that the cell be cleaned. Henderson also claims the officers bent his arms and hands causing him pain and lifted him from the floor by his throat. He also claims that his ambulatory restraints were so tight that they caused injury to his wrists and ankles. Although the defendants have provided evidence to the contrary, Henderson's allegation, if accepted by the fact finder, would be sufficient to prove claims for excessive force and/or assault and battery.

It is important to note that the defendants argue that the video evidence provided to the court refutes Henderson's claim. That is not the case. While the video evidence does show that the ankle restraints were loosely placed on Henderson, it does not clearly show the wrist restraints. While the video evidence does show that Henderson's original fall to the floor of the cell was broken by landing on his property bags, it does not refute his claim that he was forcefully slammed down. The video evidence also does not show what occurred continuously once Henderson was outside of the cell. It also does not clearly refute his claims that his arms and hands were bent or that he was lifted to his feet by his throat.

The defendants also argue that Henderson's excessive force and assault and battery claims cannot lie against individuals who were not present when a particular event occurred. While this is true, the uncontradicted evidence shows that each of the remaining defendants was present during at least one of the incidents on which Henderson bases his claims, i.e. being slammed to the cell floor, being lifted from the cell floor by his throat, being restrained on the floor with the officers bending his arms and hands or being slammed to the floor a second time outside of the cell. Whether each defendant participated in the use of force or not, each defendant present could be liable as a bystander for failing to protect Henderson from the use of force. *See Randall v. Prince George's Cnty., Md.,* 302 F.3d 188, 204 (4th Cir. 2002) (officer may be liable under § 1983 on a theory of bystander liability, if he knows that a fellow officer is violating an individual's constitutional rights and he has a reasonable opportunity to prevent the act and does not act). That being the case, I find that summary judgment may not be entered in favor of any of the defendants on Henderson's excessive force and assault and battery claims.

I also find that the entry of summary judgment is inappropriate on Henderson's retaliation claim. To state a § 1983 retaliation claim, "plaintiff [] must allege either that the retaliatory act was taken in response to the exercise of a constitutionally protected right or that the act itself violated such a right." *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994). The plaintiff must present specific evidence "establish[ing] that but for the retaliatory motive the complained of incident … would not have occurred." *Woods v. Smith*, 60 F.3d 1161, 1166 (5th Cir. 1995) Claims of retaliation must be regarded with skepticism because "[e]very act of discipline by prison officials is by definition 'retaliatory' in the sense that it responds directly to prisoner misconduct." *Adams*, 40 F.3d at 74.

Here, Henderson has presented evidence that various officers made statements that he was being moved because of his complaints. In particular, Henderson has stated that, when Ramey, Presley, Hall "and others" came to his cell on December 27, 2018, they told him that they would teach him "a lesson about complaining." Henderson claims this referenced the fact that he had filed a lawsuit against prison correctional staff a week earlier. Henderson also said that he previously had filed several complaints and grievances against defendants Presley, Hall, Bailey and others. Henderson further alleged that Sluss told him he was "going to a special place for people who like to complain." Henderson also has alleged that Clark and Sluss told him he "should learn to stop bitching and complaining" and maybe then he "wouldn't have these problems." He also alleges that Bailey, Presley and Ramey made comments that Henderson was going to learn to "stop writing shit up."

The Fourth Circuit has recognized that prison inmates have a First Amendment right to be free from retaliation for filing prison grievances in addition to their First Amendment right to petition the courts through the filing of lawsuits. *See Booker v. S.C. Dep't of Corrs.,* 855 F.3d 533 (4th Cir. 2017). Here, Henderson's evidence of statements by the defendants that he was being retaliated against for "complaining" or "writing up" incidents, along with his evidence that he had recently filed grievances and/or a lawsuit against some of the defendants is legally sufficient, if accepted by the fact finder, to prove a claim for retaliation under the First Amendment.

## PROPOSED FINDINGS OF FACTS AND CONCLUSIONS OF LAW

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. There is no genuine dispute of material fact, and the defendants are entitled to the entry of summary judgment in their favor on Henderson's conditions of confinement claim; and

2. There are genuine disputes of material facts preventing the entry of summary judgment in the defendants' favor on Henderson's remaining claims.

## RECOMMENDED DISPOSITION

Based on the above-stated reasons, I recommend that the court grant the Motion, insofar as it enter summary judgment in the defendants' favor on Henderson's conditions of confinement claim. I recommend the court deny the Motion with regard to Henderson's remaining claims.

## **Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file written objection to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable Glen E. Conrad, Senior United States District Judge.

The Clerk is directed to send copies of this Report and Recommendation to all counsel of record and unrepresented parties.

DATED: September 16, 2020.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE